# IN THE SUPREME COURT OF CALIFORNIA

PAMELA POLLOCK,
Plaintiff and Appellant,
v.
TRI-MODAL DISTRIBUTION SERVICES, INC., et al.,
Defendants and Respondents.

S262699

Second Appellate District, Division Eight
B294872

Los Angeles County Superior Court
BC676917

July 26, 2021

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Cuéllar, Kruger, Groban, and Jenkins concurred.

POLLOCK v. TRI-MODAL DISTRIBUTION SERVICES, INC.
S262699


Opinion of the Court by Liu, J.


Plaintiff Pamela Pollock is a customer service representative at defendant Tri-Modal Distribution Services, Inc. (Tri-Modal), a corporation that ships freight by truck. She alleges that Tri-Modal passed her over for several promotions in part because she refused to have sex with defendant Michael Kelso, Tri-Modal's executive vice-president. We granted review to address two questions. First, when does the statute of limitations begin to run in a failure to promote case brought under the harassment provision of the Fair Employment and Housing Act (FEHA) (Gov. Code, §§ 12940, subd. (j), 12960)? We hold that such a FEHA claim accrues, and thus the statute of limitations begins to run, at the point when an employee knows or reasonably should know of the employer's allegedly unlawful refusal to promote the employee.

Second, does Government Code section 12965, subdivision (b)'s directive that a prevailing FEHA defendant "shall not be awarded fees and costs unless the court finds the action was frivolous, unreasonable, or groundless when brought, or the plaintiff continued to litigate after it clearly became so," apply to an award of costs on appeal? The answer is yes. The Court of Appeal in this case erred in awarding costs on appeal to defendants without first finding that Pollock's underlying claim was objectively groundless.

# I.

Kelso initiated a dating relationship with Pollock in 2014. He wanted the relationship to become sexual, but Pollock refused and ended the relationship in 2016. In this action, Pollock alleges that Tri-Modal and Kelso denied her a series of promotions even though she was the most qualified candidate, and that her refusal to have sex with Kelso was a substantial factor motivating those adverse employment actions. On April 18, 2018, she filed an administrative complaint with the Department of Fair Employment and Housing (DFEH), alleging quid pro quo sexual harassment in violation of the FEHA.

Although Pollock's administrative complaint challenged the promotion of several individuals, this appeal concerns the promotion that went to Leticia Gonzalez. Gonzalez received and accepted an offer of promotion in March 2017, and the promotion took effect on May 1, 2017. There is no evidence as to whether or when Tri-Modal notified Pollock that she did not receive the promotion that went to Gonzalez. And there is no evidence that Pollock knew or had reason to know that Gonzalez was offered the promotion and accepted it in March 2017.

The March 2017 and May 2017 dates are relevant because when Pollock filed her administrative complaint, Government Code section 12960, former subdivision (d) required litigants seeking relief under the FEHA to file an administrative complaint with the DFEH within one year "from the date upon which the alleged unlawful practice . . . occurred." (All undesignated statutory references are to the Government Code.) If the failure to promote "occurred" on May 1, 2017, as Pollock argues, then her April 2018 administrative complaint was timely filed. If the failure to promote "occurred" in March 2017,

as Kelso argues, then her April 2018 administrative complaint was filed one month too late.

The trial court concluded that the failure to promote occurred in March 2017, when Gonzalez was offered the promotion and accepted it. Because Pollock did not dispute that Gonzalez received and accepted the promotion offer in March 2017, the court found no triable issue of fact as to Kelso's statute of limitations defense and granted his motion for summary judgment.

The Court of Appeal agreed that Pollock's claim was time-barred. (*Ducksworth v. Tri-Modal Distribution Services* (2020) 47 Cal.App.5th 532, 545–547 (*Ducksworth*); the named plaintiff, Bonnie Ducksworth, is not a party to this appeal.) It explained that "[t]he statute of limitations for a failure to promote runs from when the employer tells employees they have been given (or denied) a promotion. That date is key, and not the date when the promoted worker actually starts the new work." (*Id.* at p. 546.) Construing the term "occurred" in section 12960, the Court of Appeal said that "[l]ogically and thus textually, an employer injures the employee by denying a deserved promotion as an instrument of sexual harassment. That moment 'occurred' when Tri-Modal allegedly did not promote the deserving Pollock because of sexual harassment. That was in March 2017. So Pollock's injury 'occurred' in March 2017, according to the plain meaning of the word 'occurred.' [¶] This definition of 'occurred' is simple and straightforward and thus desirable and correct." (*Id.* at pp. 546–547.)

After concluding that the trial court properly granted Kelso's summary judgment motion and the summary judgment motions of two other defendants, the Court of Appeal awarded

costs on appeal to all three defendants. (*Ducksworth*, *supra*, 47 Cal.App.5th at p. 547.) The court did not find, as a predicate to awarding costs, that Pollock's underlying claim "was frivolous, unreasonable, or groundless when brought" or that she "continued to litigate after it clearly became so." (§ 12965, subd. (b).) Pollock petitioned for rehearing on the award of costs, and the Court of Appeal summarily denied her petition.

We granted review.

## II.

We begin with the statute of limitations. A statute of limitations "does not begin to run until the cause of action accrues," and a cause of action accrues at the moment when the party alleging injury is entitled to " ' "begin and prosecute an action thereon." ' " (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487 (*Romano*).) An employee who wishes to file suit under the FEHA "must exhaust the administrative remedy provided by the statute by filing a complaint with the" DFEH, "and must obtain from the [DFEH] a notice of right to sue." (*Romano*, at p. 492.) "The timely filing of an administrative complaint" before the DFEH "is a prerequisite to the bringing of a civil action for damages." (*Ibid.*)

At the time of the alleged misconduct here, the FEHA provided that no administrative complaint alleging a violation of its provisions could be filed with the DFEH "after the expiration of one year from the date upon which the alleged unlawful practice or refusal to cooperate occurred." (§ 12960, former subd. (d).) The current statute uses virtually identical language but allows for a period of three years. (§ 12960, subd. (e).) This requirement is "[t]he statute of limitations for FEHA actions." (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th

798, 811 (*Richards*).) The question is whether Tri-Modal's allegedly unlawful refusal to promote Pollock "occurred" within the then-applicable one-year statute of limitations period. Pollock says Tri-Modal's failure to promote her occurred on May 1, 2017, the effective date of Gonzalez's promotion. Kelso, echoing the Court of Appeal, says the promotion denial occurred in March 2017, when Tri-Modal offered the promotion to Gonzalez and she accepted. We conclude that neither is correct.

## A.

At the outset, we note that Pollock's failure to promote claim was pleaded as a quid pro quo sexual harassment claim under section 12940, subdivision (j), not as a discrimination claim under section 12940, subdivision (a). FEHA discrimination claims focus on the conduct of employers. (§ 12940, subd. (a) [it is an unlawful employment practice "[f]or an employer . . . to discriminate against [a] person in compensation or in terms, conditions, or privileges of employment" on the basis of a protected characteristic, subject to certain exceptions].) By contrast, FEHA harassment claims focus on the conduct of employers and the conduct of "any other person." (§ 12940, subd. (j).)

Our precedent explains that the primary difference between discrimination claims and harassment claims is that discrimination claims "address[] only *explicit* changes in the 'terms, conditions, or privileges of employment' [citation]; that is, changes involving some *official action taken by the employer*." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706 (*Roby*), italics added by *Roby*.) "In the case of an institutional or corporate employer, the *institution or corporation itself* must have taken some official action with respect to the employee,

such as hiring, firing, failing to promote, adverse job assignment, significant change in compensation or benefits, or official disciplinary action." (*Ibid.*) Harassment claims, on the other hand, "focus[] on situations in which the *social environment* of the workplace becomes intolerable because the harassment . . . communicates an offensive message to the harassed employee." (*Ibid.*) Such conduct becomes actionable as quid pro quo harassment when, as alleged in this case, " ' "a term of employment is conditioned upon submission to unwelcome sexual advances . . . ." ' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1043 (*Hughes*); cf. *ibid.* [harassing conduct also actionable as hostile work environment when so pervasive or severe that it " ' "alter[s] the conditions of employment and create[s] an abusive work environment" ' "].) In sum, "discrimination refers to bias in the exercise of official actions on behalf of the employer, and harassment refers to bias that is expressed or communicated through interpersonal relations in the workplace." (*Roby,* at p. 707.)

"The FEHA's distinction between discrimination and harassment does not mean that harassment claims are relegated to a lower status." (*Roby*, *supra*, 47 Cal.4th at p. 707.) To the contrary, "an aggrieved employee can obtain full compensation for any resulting injury," whether the alleged unlawful employment practice at issue constitutes discrimination, harassment, or both. (*Ibid.*) An employee who is the victim of discrimination based on some official action, such as a failure to promote, can "also be the victim of harassment" based on the same or similar underlying conduct. (*Ibid.*)

Indeed, "[a]lthough discrimination and harassment are separate wrongs, they are sometimes closely interrelated, and even overlapping, particularly with regard to proof." (*Roby*,

*supra*, 47 Cal.4th at p. 707.)   In a case where a supervisor threatens to deny an employee a promotion unless the employee provides the supervisor with sexual favors and the threat is realized after the employee refuses, the aggrieved employee can bring suit against both the employer and the supervisor.   The cause of action against the employer may take the form of a section 12940, subdivision (a) discrimination claim, a subdivision (j) harassment claim, or both.   The cause of action against the supervisor would take the form of a subdivision (j) harassment claim.   In such a case, the promotion decision itself "constitute[s] the *evidentiary basis* of the harassment cause of action, because the supervisor used [an] official action[] as [a] means of conveying his offensive message." (*Roby,* at p. 708.)   In other words, sometimes "the hostile message that constitutes the harassment is conveyed through official employment actions, and therefore evidence that would otherwise be associated with a discrimination claim can form the basis of a harassment claim." (*Id.* at p. 708.)   As noted, a supervisor can be liable for harassment but not discrimination; the Legislature did not make co-employees liable under the FEHA's discrimination provision.   (§ 12940, subd. (a).)

With this backdrop in mind, we note there are two ways to understand a quid pro quo harassment claim.   We express no view on whether one or both views are correct; our case law has not addressed this issue, and it was not briefed by the parties here.   One view is that a quid pro quo harassment claim targets essentially the same unlawful conduct as a hostile work environment claim:  the communication of an offensive message in the workplace.   Hostile work environment harassment occurs when a sufficiently severe or pervasive offensive message is communicated to the aggrieved employee in the workplace

(*Hughes*, *supra*, 46 Cal.4th at p. 1043); a quid pro quo harassment claim challenging an official employment action can be understood to target the offensive message conveyed by that action — namely, the message that an employment benefit has been conditioned on submission to unwanted sexual advances.

Alternatively, quid pro quo harassment may be understood as the very act of conditioning an employment benefit on submission to unwanted sexual advances. The notion is that the act itself comprises a distinct wrong, separate and apart from communication of an offensive message in the workplace. On this view, a quid pro quo harassment claim alleging unlawful denial of a promotion directly challenges the denial as based on forbidden considerations; the promotion denial does not play a meaningfully different role from the one it would play in a discrimination lawsuit brought against an employer.

In this case, we are addressing a quid pro quo sexual harassment claim that Pollock raised against Kelso, her supervisor and the executive vice-president of Tri-Modal. Our task is to determine when the actionable harassment "occurred" within the meaning of section 12960, former subdivision (d). Under either conception of quid pro quo harassment set forth above, the focus of our statute of limitations analysis is on the employment action itself. Pollock's claim can be understood to mean that an offensive message was allegedly communicated through an official employment action or that the official employment action allegedly constitutes Kelso's act of conditioning a job benefit (i.e., a promotion) on her submission to his unwanted sexual advances. Either way, our analysis must focus on when the promotion denial occurred.

**B.**

As a textual matter, it is reasonable to say that a failure to promote has "occurred" when the person seeking the promotion has been informed or is otherwise put on notice that he or she will not receive the promotion. But there are other plausible understandings of when a failure to promote has "occurred," such as the moment when the employer decides not to promote the aggrieved employee or when the employer decides to promote someone else. The term "occurred," by itself, is susceptible to more than one interpretation.

Our task in construing any statute is " 'to determine the Legislature's intent and give effect to the law's purpose.' " *(Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 633–634.) When enacting the FEHA, "the Legislature spoke at length about its purposes." (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 223.) Section 12920 explains: "It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of . . . sex," and "[i]t is recognized that the practice of denying employment opportunity and discriminating in the terms of employment for [that reason] foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advancement, and substantially and adversely affects the interests of employees, employers, and the public in general."

The Legislature further declared that in order to eliminate discrimination and harassment in the workplace, "it is necessary to provide effective remedies that will both prevent and deter unlawful employment practices and redress the

adverse effects of those practices on aggrieved persons." (§ 12920.5.) It framed "[t]he opportunity to seek, obtain, and hold employment without" experiencing discrimination or harassment as a "civil right," and instructed that the FEHA "shall be construed liberally for the accomplishment of [its] purposes." (§§ 12921, subd. (a), 12993, subd. (a).)

The Court of Appeal took the view, adopted by Kelso here, that "according to the plain meaning of the word 'occurred,' " Pollock's injury occurred when Tri-Modal decided not to "promote the deserving Pollock because of sexual harassment." (*Ducksworth*, *supra*, 47 Cal.App.5th at p. 546.) This reading of "occurred" is not unreasonable. But it includes no mention of notice to the employee. The Court of Appeal's holding would presumably allow an employer or supervisor to decide not to promote an employee but never inform the employee of that decision, and then later rely on the employer's or supervisor's own record of when the decision was made to assert that the limitations period for challenging the decision has expired. This is at odds with the principle that "section 12960 should not be interpreted to impose serious practical difficulties on an employee's ability to vindicate" the right to hold employment without experiencing discrimination or harassment "if it can be reasonably interpreted otherwise." (*Richards*, *supra*, 26 Cal.4th at p. 821; see *People v. Gonzales* (2018) 6 Cal.5th 44, 50 ["The words of a statute must be construed in context, keeping in mind the statutory purpose."].)

"In order to carry out the purpose of the FEHA to safeguard [this right], the limitations period set out in the FEHA should be interpreted so as to promote the resolution of potentially meritorious claims on the merits." (*Romano*, *supra*, 14 Cal.4th at pp. 493–494.) We have difficulty seeing how it

would serve the goal of promoting resolution of potentially meritorious claims to hold that the limitations period for a harassment claim based on a failure to promote may start to run without any notice of the promotion denial to the aggrieved employee. The better view, in light of the FEHA's purposes, is that such a claim does not accrue, and the limitations period does not begin to run, until an aggrieved employee knows or reasonably should know of the employer's decision not to promote him or her.

Aspects of the Court of Appeal's opinion implicitly recognize the importance of notice. At one point, the court said that "[t]he statute of limitations for a failure to promote runs from when the employer *tells* employees they have been given (*or denied*) a promotion." (*Ducksworth, supra,* 47 Cal.App.5th at p. 546, italics added.) In light of this statement, it is unclear why the court focused on "when Tri-Modal *offered* and Gonzalez *accepted* the promotion" (*ibid.*) instead of when Tri-Modal *told* Pollock she had been *denied* the promotion.

Toward the end of its opinion, the Court of Appeal posed a hypothetical in which "Kelso would tell Pollock [in March 2017], 'Today I am giving this promotion to someone else, even though you deserve it, because you rejected my sexual advances.' Such a candid admission would describe grossly illegal discrimination that 'occurred' in March 2017, when Kelso denied Pollock a benefit she deserved because Kelso wanted sex from her and she would not give it. So that date triggered the one-year clock. That Kelso allegedly was less than candid would not change anything fundamental about this analysis." (*Ducksworth, supra,* 47 Cal.App.5th at p. 547.) Kelso need not have spelled out an illicit reason for giving the promotion to someone else for the clock to start running. (See *Williams v. City of Belvedere*

(1999) 72 Cal.App.4th 84, 92–93 (*City of Belvedere*); *post*, at p. 17.) But a key fact in the hypothetical is that *Kelso informed Pollock* of his decision not to promote her. The Court of Appeal did not elucidate the full import of its hypothetical when it held that the moment of injury " 'occurred' " simply when Tri-Modal decided not to promote Pollock. (*Ducksworth*, at p. 546.) "To the extent [Kelso] may be understood to ask this court to adopt a rule that discourages lawsuits alleging wrongful [failure to promote] by setting the statute of limitations to run at a time that makes it inconvenient or impossible for the employee to bring a lawsuit, we decline to do so. We do not view the statute of limitations as properly performing such a function." (*Romano*, *supra*, 14 Cal.4th at p. 500.)

## C.

The parties do not cite, and we have not found, any published authorities on the meaning of "occurred" in section 12960 when the alleged unlawful practice involves quid pro quo harassment based on a failure to promote. In *Romano*, we addressed the meaning of "occurred" in a FEHA wrongful discharge action where the employer notified the plaintiff William Romano, two and a half years before the actual termination, that he would be terminated. We held that the limitations period began to run at the time of actual termination rather than at the time of notification. (*Romano*, *supra*, 14 Cal.4th at p. 503.) If an "administrative complaint must be filed within one year 'after' the unlawful practice — here, a discharge — 'occurred,' then for the purpose of that complaint, the administrative cause of action must accrue and the statute of limitations must run from the time of actual termination. It would not run from the earlier date of notification of discharge,

because on that date the unlawful practice (that is, the discharge) had not yet 'occurred.' " (*Id.* at p. 493.)

Pollock contends that under *Romano*, the limitations period for her harassment claim did not begin to run until Gonzalez's promotion took effect. But this conflates a promotion with a failure to promote. Consistent with *Romano*, a promotion may be said to occur when an employee begins working in the new position; until that point, no promotion has occurred, even if the employee has been selected for promotion. But an employer's refusal to promote an employee — the "unlawful employment practice" alleged here (§ 12940) — does not depend on any decision by the employer to promote someone else.

Suppose Employees A, B, and C apply for a promotion, and Employee A is the first applicant to be rejected. Once the employer tells Employee A that he or she will not be promoted, the employer's refusal to promote Employee A has occurred. (Cf. *City of Belvedere*, *supra*, 72 Cal.App.4th at p. 92 [distinguishing *Romano* and concluding that the statute of limitations began to run in a FEHA failure to hire case when the employer informed the plaintiff by letter that he would not be hired].) It does not matter whether or when the employer decides to promote Employee B or Employee C, or whether or when the promotion takes effect. Pollock's approach is unpersuasive because, in many cases, an employer may refuse to promote the aggrieved employee well before promoting another employee. Moreover, Pollock's rule provides no guidance in cases where the denial of a promotion to one employee is not accompanied by a decision to promote another. (See *Reynolds v. School Dist. No. 1, Denver, Colo.* (10th Cir. 1995) 69 F.3d 1523, 1535 ["the elimination of a position, if done for racially motivated reasons, can potentially form the basis of a discrimination claim" in a failure to promote

case]; *Barefield v. Board of Trustees of Cal. State University, Bakersfield* (E.D.Cal. 2007) 500 F.Supp.2d 1244, 1261 [elimination of a position for budgetary reasons does not defeat prima facie case of unlawful failure to promote if "some vacancy exist[ed] at the time the application is made"].)

In determining how section 12960 applies to a FEHA harassment claim based on a failure to promote, we look not only to California precedent but also to cases interpreting similar federal employment antidiscrimination laws. (See *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 ["Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes."].) The statute of limitations provisions of title VII of the Civil Rights Act of 1964 (Title VII) and the FEHA are substantially the same in their usage of the word "occurred." (Compare § 12960, former subd. (d) [requiring a plaintiff to file an administrative complaint within one year "from the date upon which the alleged unlawful practice . . . occurred"] with 42 U.S.C. § 2000e-5(e)(1) [requiring a plaintiff to file an administrative complaint within 180 days "after the alleged unlawful employment practice occurred"].) Other federal antidiscrimination laws incorporate Title VII's statute of limitations provision by reference. (See, e.g., 42 U.S.C. § 12117(a) [Americans with Disabilities Act].) Federal authorities interpreting such provisions thus aid our interpretation of the FEHA's statute of limitations, and those authorities indicate that a failure to promote claim accrues not simply when the employer has made the adverse promotion decision, but rather when the employee knows or reasonably should know of the employer's decision. In many cases, this

point in time is when the employer notifies the employee of its decision.

In *Delaware State College v. Ricks* (1980) 449 U.S. 250 (*Ricks*), the high court addressed whether a college professor, Columbus Ricks, "timely complained under the civil rights laws that he had been denied academic tenure because of his national origin." (*Id.* at p. 252.) On March 13, 1974, the college board of trustees formally voted to deny Ricks tenure. On June 26, 1974, the college, following its usual practice after denying tenure, offered Ricks a one-year " 'terminal' " contract expiring on June 30, 1975, which he accepted. (*Id.* at p. 253 ["When that contract expires, the employment relationship ends."].) Meanwhile, Ricks filed a grievance with the college board of trustees to contest the tenure denial, and the board denied his grievance on September 12, 1974. On April 4, 1975, Ricks filed a complaint under Title VII with the Equal Employment Opportunity Commission (EEOC). As mentioned, Title VII requires a plaintiff to file a complaint with the EEOC within 180 days "after the alleged unlawful employment practice occurred." (42 U.S.C. § 2000e-5(e)(1); see *Ricks*, at p. 256.) After the EEOC issued a "right to sue" letter, Ricks proceeded to district court and argued that the limitations period on his claim of unlawful tenure denial did not begin to run until his one-year contract expired. (*Ricks*, at pp. 252–257.)

Rejecting this argument, the high court held that the "alleged discrimination occurred — and the filing limitations period[] therefore commenced — at the time the tenure decision was made *and communicated* to Ricks." (*Ricks, supra*, 449 U.S. at p. 258, italics added; see *id.* at p. 259 ["the only challenged employment practice" was the denial of tenure, and it "occur[red] before the termination date"].) The EEOC urged the

alternative view that the limitations period did not begin until the board denied Ricks's grievance on September 12, 1974 because the board could have changed its decision if it had found Ricks's grievance meritorious. (*Id.* at pp. 260–261.) The high court rejected this argument as well, observing that "[t]he grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made." (*Id.* at p. 261.)

The district court in *Ricks* concluded that the limitations period "had commenced to run by June 26, 1974," when the college offered Ricks a " 'terminal' " one-year contract. (*Ricks*, *supra*, 449 U.S. at p. 261.) The high court declined to decide "whether the District Court correctly focused on the June 26 date, rather than the date the Board communicated to Ricks its unfavorable tenure decision made at the March 13, 1974, meeting," because Ricks's EEOC complaint was "not timely filed even counting from the June 26 date." (*Id.* at p. 262, fn. 17.) The high court explained: "By June 26, the [faculty committee on promotions and tenure] had twice recommended that Ricks not receive tenure; the Faculty Senate had voted to support the tenure committee's recommendation; and the Board of Trustees formally had voted to deny Ricks tenure. In light of this unbroken array of negative decisions, the District Court was justified in concluding that the College had established its official position — *and made that position apparent to Ricks* — no later than June 26, 1974." (*Id.* at p. 262, fn. omitted, italics added; see *id.* at p. 262, fn. 16 ["We recognize . . . that the limitations periods should not commence to run so soon that it becomes difficult for a layman to invoke the protection of the civil rights statutes. [Citations.] But . . . there can be no claim here that Ricks was not abundantly forewarned."].)

In *Romano*, we declined to apply *Ricks*'s holding under Title VII to a wrongful discharge claim under the FEHA. (*Romano*, *supra*, 14 Cal.4th at pp. 495–499.) But nothing we said in *Romano* casts doubt on *Ricks*'s persuasive value in a FEHA failure to promote case. We explained that the FEHA differs from Title VII insofar as "the FEHA defines a 'discharge' as a discriminatory practice" in contrast to "the federal law's focus . . . on the *decision*" to terminate employment. (*Romano*, at p. 498; see *id.* at pp. 492–493, quoting §§ 12940, former subd. (f), 12941.) But an employer's decision not to promote the aggrieved employee is the gravamen of a failure to promote claim under either Title VII or the FEHA; there is no distinction like the one we drew in *Romano* between the decision and the wrongful act. Further, in explaining *Ricks*'s inapplicability to Romano's wrongful discharge claim, we observed that the high court in *Ricks* "was at pains to assert that it was the denial of tenure, and not the ultimate dismissal, that was the discriminatory act *alleged* by the plaintiff." (*Romano*, at p. 497; see *Ricks*, *supra*, 449 U.S. at pp. 257–258.) That aspect of Ricks's claim makes it analogous to a failure to promote claim and highlights the relevance of the high court's analysis to the case before us. Finally, *Romano* expressed concern that following *Ricks* would " 'increase the number of unripe and anticipatory lawsuits . . . that should not be filed until some concrete harm has been suffered, and until the parties, and the forces of time, have had maximum opportunity to resolve the controversy.' " (*Romano*, at p. 498.) But this concern, which applies where an employee receives notice of termination before the date of actual termination, has no applicability here. Once the employer has told the employee that he or she will not be promoted or the employee otherwise gains actual or constructive

knowledge of the allegedly unlawful promotion decision, a " 'concrete harm has been suffered' " (*ibid.*), and any FEHA claim contesting the promotion denial accrues.

In *Lukovsky v. City and County of San Francisco* (9th Cir. 2008) 535 F.3d 1044, the court observed that *Ricks* "focused on when the plaintiff became aware of the adverse employment decision" and applied this focus to determine when the limitations period began to run on an unlawful failure to hire claim. (*Lukovsky*, at p. 1050, citing *Ricks*, *supra*, 449 U.S. at pp. 258–259, 261–262.) The Ninth Circuit clarified that "the claim accrues upon awareness of the actual injury, i.e., the adverse employment action, and not when the plaintiff suspects a legal wrong." (*Lukovsky*, at p. 1049; see *id.* at p. 1051 [plaintiffs' claims accrued, and the limitations periods began to run, when they "knew they had been injured and by whom, [citation], even if at that point in time the plaintiffs did not know of the legal injury, i.e., that there was an allegedly discriminatory motive underlying the failure to hire"].) Other federal circuits are in accord. (See, e.g., *Hanani v. State of N.J. Dept. of Environmental Protection* (3d Cir. 2006) 205 Fed.Appx. 71, 76 [failure to promote]; *Amini v. Oberlin College* (6th Cir. 2001) 259 F.3d 493, 498–500 (*Amini*) [failure to hire]; *Merrill v. Southern Methodist Univ.* (5th Cir. 1986) 806 F.2d 600, 605 [tenure denial].)

Although many cases, like *Ricks*, involve clear notification by the employer to the employee of the adverse employment decision, others do not. In assessing when a limitations period begins to run, courts have spoken in terms of actual or constructive notice — i.e., " '[o]nce the employee is aware or reasonably should be aware of the employer's decision, the limitations period commences.' " (*Amini*, *supra*, 259 F.3d at

p. 498, quoting *EEOC v. United Parcel Service, Inc.* (6th Cir. 2001) 249 F.3d 557, 561–562; see *Harris v. City of New York* (2d Cir. 1999) 186 F.3d 243, 247 (*Harris*); *Miller v. Beneficial Management Corp.* (3d Cir. 1992) 977 F.2d 834, 843 (*Miller*).) Determining what an employee knew or should have known requires a careful examination of the circumstances in each case.

In *Harris*, a police officer, Gerard Harris, alleged (among other claims) that he had been denied promotion to sergeant. (*Harris, supra,* 186 F.3d at pp. 246–247.) Harris had taken a civil service exam that placed him on a four-year eligibility list for sergeant from April 7, 1989 to April 7, 1993. In August 1991, Harris suffered a back injury in the line of duty; he was placed on " 'restricted duty' " status and later applied for and received disability benefits. (*Id.* at p. 246.) On August 31, 1994, he filed an EEOC complaint alleging that the city unlawfully discriminated against him on the basis of disability in refusing to promote him to sergeant, and he filed suit in district court on October 4, 1996. (*Id.* at pp. 247–248; see *id.* at p. 247 [statute of limitations under the Americans with Disabilities Act, 42 U.S.C. § 12117(a), incorporates by reference the statute of limitations under Tit. VII, 42 U.S.C. § 2000e-5(e)(1)].) The Second Circuit held that because civil service eligibility lists "are ordinarily in effect for no more than four years" under state law, and because a 1990 police department policy memo said the department "would not promote any officer on less than full duty," Harris "should have known" by April 7, 1993 that "he was not going to be promoted to sergeant." (*Harris,* at p. 248; see *ibid.* ["we look not only at what Harris actually knew but also at what he had reason to know"].) The commencement of the applicable limitations periods on that date meant that his claims before the

EEOC and in court challenging the denial of promotion to sergeant were filed too late. (*Harris,* at pp. 248–249.)

In *Miller*, an attorney, Elizabeth Miller, alleged that her employer refused to promote her to vice-president in violation of Title VII, the Age Discrimination in Employment Act (ADEA), and other laws. (*Miller, supra,* 977 F.2d at p. 841; see *id.* at p. 842 [limitations periods for filing EEOC complaint under Tit. VII, 42 U.S.C. § 2000e-5(e)(1), and the ADEA, 29 U.S.C. § 626(d)(1), start to run after the alleged unlawful practice "occurred"].) In July 1984, Miller was transferred from the company's legal department to an associate counsel position in the government relations department. In assuming that role, she replaced a man, Charles Walsh, who was serving as vice-president of government relations, and another man who worked with the vice-president. (*Miller,* at pp. 836–837.) Miller kept working in the government relations department until October 1998 and was never promoted to vice-president. (*Id.* at p. 840.)

The district court held that the limitations periods for her failure to promote claim began to run in July 1984, reasoning that " 'Miller does not assert she was unaware that Walsh's position was Vice President when she accepted the position as Associate Counsel. Accordingly, Miller had actual knowledge of any alleged discrimination [in the company's failure to promote her to vice-president] at the time she accepted and assumed the position in July 1984.' " (*Miller, supra,* 977 F.2d at p. 842.) But the Third Circuit cited evidence that from September 1987 to June 1988, Miller's supervisor had told her that "she deserved to be a Vice President" and "she would soon be getting the title of Vice President," and had "recommended Miller for promotion to Vice President." (*Id.* at p. 843.) Miller argued it was not until

October 1988, when she was removed from the government relations department, that "it became apparent that she would not be made a Vice President." (*Ibid.*) On these facts, the Third Circuit held that the timeliness of her complaint presented a triable issue. (*Ibid.* ["A reasonable jury could agree with Miller that the statute did not begin to run until October 1988, when she knew or should have known that she would never be made a Vice President."].)

In this case, Pollock focuses on the effective date of Gonzalez's promotion, and Kelso focuses on when Gonzalez received and accepted the promotion offer. Both dates, depending on how Tri-Modal communicated the information, may be relevant evidence of when Pollock knew or should have known she did not get the promotion. But neither is sufficient by itself to trigger the limitations period.

Consistent with the case law construing analogous language in federal antidiscrimination statutes, we hold that a FEHA harassment claim based on a failure to promote accrues, and the limitations period under section 12960 begins to run, when the aggrieved employee knows or reasonably should know of the employer's decision not to promote him or her. It is not enough to identify when an employer made its decision not to promote the employee; what starts the clock is the employee's actual or constructive knowledge of the employer's decision.

### D.

The approach we elucidate today "protect[s] defendants from the necessity of defending stale claims and require[s] plaintiffs to pursue their claims diligently." (*Romano, supra,* 14 Cal.4th at p. 488; see *ibid.* [statutes of limitation "are ' "designed to promote justice by preventing surprises through

the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared" ' "].)  Focusing the analysis on when the employee knew or should have known of the adverse promotion decision in many cases gives the employer control over when the clock begins to run.  Once the employee obtains actual or constructive notice, he or she is then prompted to diligently pursue any claims.

This approach also protects the employee's interests. Because the clock starts running only when the employee knows or reasonably should know of the adverse promotion decision, any period of time during which the decision is not disclosed or otherwise known to the employee does not count against the limitations period.  The rule urged by Kelso, which focuses on the employer's moment of decision without requiring notice to the employee, would reward secrecy by employers to the potential detriment of employees with legitimate claims.  As noted, we must interpret section 12960 "so as to promote the resolution of potentially meritorious claims on the merits." (*Romano*, *supra*, 14 Cal.4th at p. 494.)

Further, by leaving an employee guessing as to when an employer has made an adverse promotion decision, Kelso's rule may incentivize plaintiffs to file claims as early as possible to avoid being time-barred, even if the employer (unbeknownst to the employee) has not yet "established its official position." (*Ricks*, *supra*, 449 U.S. at p. 262.)  Requiring actual or constructive notice reduces the risk of plaintiffs filing unripe claims. (Cf. *Romano*, *supra*, 14 Cal.4th at pp. 494–495 [§ 12960 should be interpreted so that DFEH and the courts are not prematurely drawn into investigating and adjudicating FEHA claims].)

In Pollock's view, starting the limitations period in a failure to promote case at the point of notice would depart from *Romano* and thereby create different rules for different circumstances within the FEHA statute of limitations case law. But lack of notice was not at issue in *Romano*, so we had no occasion to address situations where it may be unclear when the aggrieved employee knew or should have known of the allegedly unlawful conduct. In *Romano*, the plaintiff was told he would be discharged, but at that point, the employer had not yet discharged him. Here, Tri-Modal denied Pollock a promotion, but we do not know when Pollock learned of the denial. Both cases are consistent with a rule requiring both wrongful conduct by the employer and actual or constructive notice to the employee for the limitations period to start.

Finally, our construction of the FEHA statute of limitations is not at odds with section 12960, former subdivision (d)(1), which provided that the one-year limitations period may be extended "[f]or a period of time not to exceed 90 days following the expiration of that year, if a person allegedly aggrieved by an unlawful practice first obtained knowledge of the facts of the alleged unlawful practice after the expiration of one year from the date of their occurrence." (See § 12960, subd. (e)(1) [similar language in current statute].) Citing this provision, Kelso contends that "the Legislature has provided a remedy for delayed discovery of unlawful discriminatory employment acts"; the implication is that construing the statute of limitations to require notice before the clock begins to run would render the delayed discovery provision surplusage.

We reject Kelso's argument for two reasons that track the two views of quid pro quo harassment described above. (*Ante*,

23

at pp. 7–8.) On the first view, which focuses on communication of an offensive message, a quid pro quo harassment claim cannot accrue until the offensive message — here, that an employee was denied a promotion because of her refusal to submit to a supervisor's sexual advances — actually or constructively reaches the employee. In other words, notice of the employment action is integral to the existence of a claim of quid pro quo harassment. Such notice cannot be characterized as "delayed discovery of unlawful discriminatory employment acts"; rather, the notice — by virtue of its communicative impact — is a necessary component of the unlawful discriminatory employment act. On this view, the 90-day delayed discovery provision is not relevant to this case.

Under the second view of quid pro quo harassment, the failure to promote Pollock is relevant not because it communicates an offensive message, but instead because it demonstrates that Kelso in fact conditioned a job benefit on Pollock's submission to his sexual advances. Kelso asserts that, on this view, the 90-day delayed discovery provision is relevant to Pollock's claim because section 12960, former subdivision (d)(1) indicates that the Legislature did not intend for notice to be part of the accrual rule for FEHA claims, including discrimination and quid pro quo harassment claims.

But Kelso's argument misapprehends the import of section 12960, former subdivision (d)(1), which the court in *City of Belvedere*, *supra*, 72 Cal.App.4th 84, elucidated. The plaintiff in that case, Lewis Williams, applied to be a police officer. On June 21, 1994, the city notified Williams by letter that he had not been selected. On October 27, 1995, he learned that racial discrimination may have played a part in the city's decision not to hire him. On November 13, 1995, he filed a complaint with

the DFEH alleging racial discrimination and thereafter proceeded to superior court. (*Id.* at pp. 87–88.) In assessing the timeliness of his DFEH complaint, the Court of Appeal held that "the unequivocal wording of the June 21, 1994, letter" notified Williams that the city had made a "final" decision not to hire him, and thus the limitations period began to run on that date. (*Id.* at p. 91; see *id.* at pp. 91–92 [distinguishing *Romano*].) The court then addressed Williams's argument that the limitations period "was tolled during the period he did not know he was the subject of discrimination" as a matter of "equitable principles." (*Id.* at p. 92.) On this point, the court cited section 12960's delayed discovery provision (a predecessor version virtually identical to the provision at issue here) and explained: "Thus the Legislature anticipated there may be situations where a person does not learn he was the subject of discrimination until after the one-year period has passed, and it provided a remedy when that occurs: an extension 'not to exceed 90 days.' Since the Legislature has provided a remedy for the problem Williams has identified, we decline to formulate a different remedy." (*City of Belvedere*, at p. 93.) Because Williams had filed his DFEH complaint more than 90 days beyond the one-year limitations period, the court concluded that it was untimely. (*Id.* at p. 94.)

We express no view on whether *City of Belvedere* correctly held that equitable tolling is unavailable in light of the delayed discovery provision. (Cf. *McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 107 ["We discern in [section 12960, former subdivision (d)(1)–(4)] no basis for limiting the application of equitable tolling."]; *id.* at p. 107, fn. 4 [distinguishing without approving *City of Belvedere*'s holding].) For present purposes, we simply observe that *City of Belvedere*'s

understanding of the scenario addressed by the 90-day delayed discovery provision flows from a natural reading of its terms.

The provision addresses a situation where "a person allegedly aggrieved by an unlawful practice first obtained knowledge of *the facts of* the alleged unlawful practice after the expiration of one year from the date of their occurrence." (§ 12960, former subd. (d)(1), italics added; see § 12960, subd. (e)(1).) The provision does not address a situation where a person "first obtained knowledge of the alleged unlawful practice" after the one-year limitations period. The phrase "knowledge of *the facts of* the alleged unlawful practice" suggests the discovery of specific features or circumstances of the alleged unlawful practice, not its mere existence. (§ 12960, former subd. (d)(1), italics added.) The scenario, as in *City of Belvedere*, is one in which a person is aware of the alleged unlawful practice (i.e., the person knows he or she has been harassed, fired, not promoted, not hired, or otherwise injured) but does not become aware of relevant facts until after the ordinary limitations period has expired. As case law suggests, this scenario is not uncommon (*ante*, at p. 17), and the provision is naturally read to address it. By contrast, there is scant indication of cases where a person was entirely unaware of the alleged unlawful practice throughout the ordinary limitations period and only later became aware of it. There is little basis to infer that the provision was meant to address such a scenario.

In sum, section 12960, former subdivision (d)(1) does not undermine our conclusion that a FEHA quid pro quo harassment claim based on a failure to promote begins to run at the point when the aggrieved employee knows or reasonably should know of the allegedly unlawful promotion decision.

## E.

A further question that divides the parties is whether the burden of proving when the employee knew or should have known of the adverse promotion decision falls on the plaintiff or defendant. Pollock argues that because notice to the aggrieved employee is an element the statute of limitations defense, the burden falls on the defendant. Kelso contends that the burden falls on the aggrieved employee to prove lack of knowledge in response to the defendant's statute of limitations defense. We hold that Pollock has the better view.

The statute of limitations is an affirmative defense, and as with any affirmative defense, the burden is on the defendant to prove all facts essential to each element of the defense. (Evid. Code, § 500 ["Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the . . . defense that he is asserting."]; see *Samuels v. Mix* (1999) 22 Cal.4th 1, 10 ["a defendant must prove the facts necessary to enjoy the benefit of a statute of limitations"]; *Kaiser Foundation Hospitals v. Workers' Comp. Appeals Bd.* (1985) 39 Cal.3d 57, 67, fn. 8 ["The running of the statute of limitations is an affirmative defense . . . and the burden of proving it has run, therefore, is on the party opposing the claim" (citation omitted)].) In a FEHA harassment case based on a failure to promote, an element of the statute of limitations defense is that the plaintiff knew or should have known about the employer's adverse promotion decision more than one year (or now, three years) before filing his or her administrative complaint. (§ 12960, former subd. (d); see § 12960, subd. (e).) The burden is on the defendant to prove all facts essential to that element.

This approach makes sense because the timing and manner of notifying an employee of an adverse promotion decision are often uniquely within the defendant's control. The defendant is often a supervisor or employer that has control over the promotion process, and it is such a defendant's prerogative to decide if, when, and how an employee will be notified of a promotion decision. To be sure, the employee has personal knowledge that is relevant to the inquiry. And there may be cases where the defendant does not have control over the notification process or where express notification is difficult to effectuate. But, on balance, placing the burden of proof on the defendant properly incentivizes clear and timely notification to the employee by the party that is in the best position to promote clarity and certainty as to when the limitations period begins.

Kelso argues that "[e]ven if it is true that the statute of limitations is an affirmative defense and defendants must prove that the plaintiff's claim is untimely, a plaintiff seeking to establish a triable issue of material fact regarding the affirmative defense has the burden of producing evidence to create a dispute." In his view, once he "proved that Pollock's claimed harm accrued before the one-year limitation period, the burden shifted to Pollock to prove that she did not have knowledge, did not discover, and did not know of facts that would cause a reasonable person to suspect she has suffered harm that was caused by someone's wrongful conduct."

But Kelso has not proven that Pollock's claimed harm accrued before the beginning of the one-year statute of limitations period. The Directions for Use for CACI No. 454 explain that " '[c]laimed harm' refers to all of the elements of the cause of action, which must have occurred before the cause of action accrues and the statute of limitations begins." Kelso has

merely shown that Gonzalez received and accepted an offer of promotion in March 2017. He has not shown that Pollock had actual or constructive notice of the disputed promotion decision in March 2017. Thus, he has not shown sufficient facts to make out his statute of limitations defense.

Kelso relies on *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, but that case does not help his argument. *Aguilar* involved a summary judgment motion contesting a core element of the plaintiff's underlying antitrust claim. (*Id.* at pp. 838–840.) We noted that "how the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on" the issues addressed in the given summary judgment motion. (*Id.* at p. 851.) For example, we explained that how the parties meet their respective burdens can depend on "*which* [party] would bear *what* burden of proof at trial." (*Ibid.*) Because *Aguilar* does not discuss how the parties might meet their respective burdens with regard to a statute of limitations defense, it does not speak to the question here.

Kelso also relies on CACI Nos. 454 and 455 to argue that if Pollock did not know of the adverse promotion decision in March 2017, the burden was on her to invoke the common law delayed discovery rule. Courts have relied on that rule to toll or expand the statute of limitations in cases where starting the limitations period on the date of the plaintiff's injury would be " 'manifestly unjust' " because "[t]he injury or the act causing the injury, or both, have been difficult for the plaintiff to detect." (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 826, 831.) The rule has been applied in cases involving breach of a fiduciary relationship, professional malpractice, underground trespass, personal injury, invasion of the right to privacy, libel,

and latent defects in real property. (*Id.* at pp. 827–830.) In such cases, the burden typically falls on the plaintiff to "plead facts sufficient to convince the trial judge that delayed discovery was justified. And when the case is tried on the merits the plaintiff bears the burden of proof on the discovery issue." (*Id.* at p. 832.)

Here, however, discovery of the adverse promotion decision is part of the accrual rule. (See *Cada v. Baxter Healthcare Corp.* (7th Cir. 1990) 920 F.2d 446, 450 [elucidating the distinction "between the *accrual* of the plaintiff's claim and the *tolling* of the statute of limitations"].) The date of accrual "is not the date on which the wrong that injures the plaintiff occurs, but the date — often the same, but sometimes later — on which the plaintiff discovers that he has been injured. . . . The discovery rule is implicit in the holding of *Ricks* that the statute of limitations began to run 'at the time the tenure decision was made *and communicated* to Ricks,' 449 U.S. at 258, 101 S.Ct. at 504 (emphasis added)." (*Ibid.*) As case law indicates (*ante*, at pp. 12–20), a refusal to promote has not "occurred" for purposes of the statute of limitations until the aggrieved employee has had actual or constructive notice.

In sum, when a defendant asserts a statute of limitations defense against a FEHA failure to promote claim, the burden is on the defendant to prove when the plaintiff knew or should have known of the adverse promotion decision. The Court of Appeal in this case concluded that the statute of limitations began to run when Tri-Modal offered the promotion to Gonzalez and she accepted it. It did not discuss when Pollock knew or should have known that she was denied the promotion, nor did it discuss whether Kelso, in asserting his statute of limitations defense, established any facts concerning Pollock's actual or

constructive knowledge. Accordingly, we reverse and remand for further proceedings consistent with our opinion.

## III.

We now turn to costs on appeal. Code of Civil Procedure section 1034, subdivision (b) charges the Judicial Council with establishing "allowable costs on appeal and the procedure for claiming those costs." The Judicial Council promulgated California Rules of Court, rule 8.278 (Rule 8.278), which says: "Except as provided in this rule, the party prevailing in the Court of Appeal in a civil case other than a juvenile case is entitled to costs on appeal." (Rule 8.278(a)(1).) The rule further says: "In the interests of justice, the Court of Appeal may also award or deny costs as it deems proper." (Rule 8.278(a)(5).)

Separately, the Legislature spoke directly to the subject of costs and fees in the FEHA itself. Section 12965, subdivision (b) (section 12965(b)), which provides a private right of action to enforce the FEHA, says in relevant part: "In civil actions brought under this section, the court, in its discretion, may award to the prevailing party . . . reasonable attorney's fees and costs, . . . except that . . . a prevailing defendant shall not be awarded fees and costs unless the court finds the action was frivolous, unreasonable, or groundless when brought, or the plaintiff continued to litigate after it clearly became so."

The question is whether costs on appeal in a FEHA action are governed by section 12965(b) or by Rule 8.278(a). The former requires a finding that the plaintiff's claim was frivolous before costs may be awarded to a prevailing defendant; the latter does not. The Court of Appeal here made no such finding before awarding costs to defendants.

As an initial matter, section 12965(b) by its terms governs the authority of "the court" to award fees and costs, with no limitation on "the court" to which the provision applies.  There is no reason why an appellate court cannot determine whether "the action was frivolous, unreasonable, or groundless when brought" or whether "the plaintiff continued to litigate"— including by taking an appeal— "after it clearly became so." (*Ibid.*)  Nothing in the text of section 12965(b) suggests it does not apply to appellate courts.

Kelso argues that Rule 8.278 speaks directly to costs on appeal, whereas section 12965(b) "is silent regarding its application to costs on appeal" and should be understood to govern costs only in the trial court.  We rejected a similar argument in *Morcos v. Board of Retirement* (1990) 51 Cal.3d 924 (*Morcos*).  The Court of Appeal in *Morcos* had held that because section 31536 authorizes " '*the superior court* in its discretion' " to award reasonable attorney's fees to prevailing plaintiffs in cases involving retirement benefits and says "nothing about the Courts of Appeal or Supreme Court having a similar authority to award fees, the statute should not be construed to grant such authority to the appellate courts."  (*Morcos*, at p. 927, italics added by *Morcos,* quoting § 31536.)  We disagreed, explaining that such an interpretation would undermine "the purpose of section 31536— to place the government and individual pensioners on a level playing field when it comes to litigation over benefits." (*Morcos*, at p. 929.)  That goal could only be achieved, we concluded, if successful pensioners could recover attorney's fees in appellate courts as well as the superior court. (*Ibid.*)

Although the text of section 31536 "only made express reference to the superior court," we unanimously concluded in

*Morcos* that the statute also applied to appellate courts based on its purpose and legislative history. (*Morcos*, *supra*, 51 Cal.3d at p. 928.) Section 12965(b), by comparison, makes express reference to "the court," without limitation. And construing section 12965(b) to apply to appellate costs and fees furthers the statute's purpose of promoting vigorous enforcement of our civil rights laws by " 'encourag[ing] persons injured by discrimination to seek judicial relief.' " (*Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 112 (*Williams*) [quoting legislative history of § 12965(b)].)

When the Legislature in 2018 amended section 12965(b) by adding the phrase "a prevailing defendant shall not be awarded fees and costs unless the court finds the action was frivolous, unreasonable, or groundless when brought, or the plaintiff continued to litigate after it clearly became so" (Assem. Bill No. 9 (2019–2020 Reg. Sess.); Stats. 2019, ch. 709, § 2, subd. (b)), it made its intentions clear. The Assembly Judiciary Committee explained that California courts depart from the "so-called 'American Rule' where each party is responsible for its own fees and costs" in civil rights cases and that "the provision in this bill limiting the ability of a prevailing defendant to recover fees and costs unless the plaintiff's case is deemed frivolous or without merit appears to codify existing case law." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1300 (2017–2018 Reg. Sess.) as amended May 25, 2018, p. 8.) The Senate Judiciary Committee said that "[u]nder existing law, FEHA provides for an award of attorneys' fees to a prevailing plaintiff, but not to a defendant except under narrow circumstances," in order to "reflect[] the public policy that society should incentivize enforcement of our civil rights laws." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1300 (2017–

2018 Reg. Sess.) as amended Apr. 4, 2018, p. 24.)  To allow a prevailing FEHA defendant to collect fees and costs on appeal when the plaintiff brought a potentially meritorious suit that ultimately did not succeed would undercut the Legislature's intent to promote vigorous enforcement of our civil rights laws. (See *Williams*, *supra*, 61 Cal.4th at pp. 113–115.)

Kelso contends that costs on appeal are likely lower on average than costs at the trial level.  Even if so, such costs "can be substantial, and the possibility of their assessment could significantly chill the vindication of employees' civil rights." (*Williams*, *supra*, 61 Cal.4th at p. 114.)  In *Williams*, we held that the award of ordinary trial court costs in FEHA litigation is governed by section 12965(b), not by the general fee-shifting provision of Code of Civil Procedure section 1032, subdivision (b).  (*Williams*, at p. 99.)  Although the language of section 12965(b) at the time did not "distinguish between awards to FEHA plaintiffs and to FEHA defendants," we concluded on the basis of legislative history and public policy that "the Legislature intended trial courts to use the asymmetrical standard of [*Christiansburg Garment Co. v. EEOC* (1978) 434 U.S. 412] as to both fees and costs." (*Williams*, at p. 109.)  Under that standard, "an unsuccessful FEHA plaintiff should not be ordered to pay the defendant's fees or costs unless the plaintiff brought or continued litigating the action without an objective basis for believing it had potential merit." (*Id.* at pp. 99–100.)  We observed that "ordinary costs in FEHA cases," though typically less than attorney's fees, can still be substantial and that "[t]he Legislature could well have believed the potential for a cost award in the tens of thousands of dollars would tend to discourage even potentially meritorious suits by plaintiffs with limited financial resources." (*Id.* at

p. 113.) These considerations informed our conclusion that a trial court must find the plaintiff's FEHA claim objectively groundless before awarding costs to a prevailing defendant. (*Id.* at pp. 113–115.) Similarly here, even if costs on appeal are lower on average than the "tens of thousands of dollars" typical at the trial court level, such costs can still be large enough to discourage employees from coming forward with potentially meritorious claims. (*Id.* at p. 113.)

Kelso says *Williams* is distinguishable because Rule 8.278, unlike Code of Civil Procedure section 1032, subdivision (b), does not include the phrase "except as otherwise expressly provided by statute." (See *Williams*, *supra*, 61 Cal.4th at p. 105 ["section 12965(b) is an express exception to Code of Civil Procedure section 1032(b)"].) But even without such language, a rule of court must yield to an applicable statute when " 'it conflicts with either the statute's express language or its underlying legislative intent.' " (*In re Abbigail A.* (2016) 1 Cal.5th 83, 92; see *People v. Hall* (1994) 8 Cal.4th 950, 960; Cal. Const., art. VI, § 6, subd. (d) [rules adopted by the Judicial Council "shall not be inconsistent with statute"].) Section 12965(b) expressly governs "the court" in FEHA actions without limitation, and allowing an award of costs on appeal to a prevailing defendant without a finding that the plaintiff's action was objectively groundless would undermine the statute's purpose.

Finally, Kelso argues that construing section 12965(b) to apply to costs on appeal would "incentivize FEHA plaintiffs who do not prevail in the trial court to appeal nonetheless, even in appeals that arguably lack merit." But an appeal that "arguably" lacks merit may well be recast as an appeal that "arguably" has merit, and we see no indication that the

Legislature intended to discourage such appeals. To the contrary, the Legislature sought to encourage aggrieved employees to pursue potentially meritorious FEHA claims, and exposing plaintiffs who bring nonfrivolous appeals to the risk of paying defendants' costs if unsuccessful would be inconsistent with that objective.

In sum, we hold that section 12965(b) applies to costs on appeal. An appellate court may not award costs or fees on appeal to a prevailing FEHA defendant without first determining that the plaintiff's action was frivolous, unreasonable, or groundless when brought, or that the plaintiff continued to litigate after it clearly became so. In making this determination, the court "should exercise caution to avoid 'hindsight bias.'" (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 986; see *id.* at p. 987 [noting that *Christiansburg Garment Co. v. EEOC, supra,* 434 U.S. 412, 421–422, "caution[ed] courts, in deciding whether to award attorney fees to a prevailing defendant in an antidiscrimination action, to 'resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation'"]; *Williams, supra,* 61 Cal.4th at pp. 99–100 ["an unsuccessful FEHA plaintiff should not be ordered to pay the defendant's fees or costs unless the plaintiff brought or continued litigating the action without an objective basis for believing it had potential merit"].)

Upon such a finding, an appellate court has discretion to award the full amount of costs and fees, a reduced amount, or no amount at all. Because the Court of Appeal made no finding as to whether Pollock's claims were objectively groundless, we vacate its award of costs to defendants.

## CONCLUSION

We reverse the Court of Appeal's judgment, vacate its award of costs on appeal, and remand the matter to that court so that it may remand the case to the superior court for further proceedings consistent with this opinion.

**LIU, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Pollock v. Tri-Modal Distribution Services, Inc.

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 47 Cal.App.5th 532
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S262699
**Date Filed:** July 26, 2021

---

**Court:** Superior
**County:** Los Angeles
**Judge:** Lia R. Martin

---

**Counsel:**

Lipeles Law Group, Kevin A. Lipeles, Thomas H. Schelly and Julian B. Bellenghi for Plaintiff and Appellant.

Larson & Gaston, Daniel K. Gaston and Gloria G. Medel for Defendants and Respondents Scotts Labor Leasing Company, Inc., and Pacific Leasing, Inc.

Lewis Brisbois Bisgaard & Smith, Jack E. Jimenez, Jeffrey B. Ranen, Lann G. McIntyre and Tracy D. Forbath for Defendant and Respondent Mike Kelso.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Julian B. Bellenghi
Lipeles Law Group, APC
880 Apollo St., Suite 336
El Segundo, CA 90245
(310) 322-2211

Lann G. McIntyre
Lewis Brisbois Bisgaard & Smith LLP
550 West C St., Suite 1700
San Diego, CA 92101
(619) 699-4976